Filed 2/16/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H043029[*] |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1367902) |
| v. | |
| JAMES DRYDEN, | |
| Defendant and Appellant. | |

A jury convicted James Dryden of two counts of assault with a deadly weapon. He was sentenced under the Three Strikes law to 25 years to life, consecutive to 15 years. He contends that the trial court committed prejudicial evidentiary error by admitting two uncharged acts to prove absence of self-defense, and instructional error related to those acts. He also raises cumulative prejudice, ineffective assistance of counsel, and sentencing error.

We conclude that the trial court abused its discretion admitting the earlier (2007) uncharged act under Evidence Code section 1101, subdivision (b) because defendant's state of mind cannot reasonably be inferred from that remote and dissimilar act. Admitting the later (2012) uncharged act was also an abuse of discretion because the evidence was substantially more prejudicial than probative under Evidence Code section 352. But we find no due process violation, and we find the errors harmless under state law standards and not cumulatively prejudicial.

---

[*]In resolving this appeal, we do not consider defendant's pro se submission received in November 2019. (See *In re Barnett* (2003) 31 Cal.4th 466, 469 ["represented parties have no right to present their cases personally alongside counsel"].)

We further find no ineffective assistance of counsel and no abuse of discretion in the denial of defendant's request to reduce the convictions to misdemeanors. However, we reach a different conclusion about the denial of defendant's motion to strike his prior convictions under Penal Code section 1385. As we will explain, strict application of the Three Strikes law in this case resulted in a sentence so out of proportion to the offenses as to be an abuse of discretion. We will reverse the judgment and remand the matter for resentencing, with instructions to revisit the issue of defendant's prior strike convictions, and to implement sentencing reforms enacted during the pendency of this appeal affecting prior prison term and prior serious felony enhancements.

## I. BACKGROUND

Defendant was causing a late-night disturbance in a Jack in the Box restaurant in October 2013. He was 51 years old, homeless, and intoxicated. According to witnesses, defendant became belligerent and started throwing food when a young male unwittingly took his seat in the restaurant. That male was 17-year-old L.J. who had spent the evening socializing in a nearby motel room with several friends. They encountered defendant around 2:30 a.m. after they left the room to get food.

Defendant was asked to leave Jack in the Box and in the parking lot he encountered one or more young men, including L.J., Ben, Jesse (who arrived at the restaurant by bicycle and was later involved in a stick fight with defendant), Nick (Jesse's friend and a United States Marine, also on a bicycle and involved in the stick fight), possibly Sean (also involved in the stick fight), and possibly Juan (who had been socializing with L.J., Ben, and Sean). Defendant was obstreperous and disorderly before retreating across the street toward a Wienerschnitzel restaurant. Jesse testified that defendant was kicking his leg, telling the group to "back away," and saying things like "you don't know me," and "I'll kill all of you right now." Witness accounts vary as to

2

when the encounter became physical. Ben told an officer at the scene that he kicked defendant who was being physically aggressive as they left Jack in the Box, but at trial he testified that defendant was only verbally abusive at the outset and he did not kick him until much later. L.J. testified that he went home after defendant struck him in the face with "a stick or a cane."

Sean testified that he left the motel a few minutes after L.J. and Ben went to Jack in the Box. He went to Wienerschnitzel across the street from Jack in the Box but did not order anything. As he was walking back to the corner and not paying attention to his surroundings, he heard someone say " 'hey, you must be one of them too.' " He turned around and defendant hit him three times with a stick. Sean fell, and as he was getting up, Jesse and Nick approached on bicycles and started yelling at defendant. Sean walked away during the fray and returned to Wienerschnitzel. He explained to an officer at the scene, "I think he's got a real reason, but [] I'm not, like the dude."

Jesse testified that a short time after defendant left Jack in the Box, from his vantage point inside the restaurant he could see defendant on the other side of the street walking with a bamboo stick about four feet long. He saw defendant "bump" the front of someone he did not recognize who turned out to be Sean. Jesse testified that defendant "started wielding the stick toward" Sean, causing Sean to back up with his arms in the air. Afraid for Sean, Jesse and Nick ran across the street with their bicycles and interceded. Defendant swung the stick at Jesse, yelling " '[y]ou're one of them,' " and " '[n]ow I'm going to come after you.' " Jesse was struck on the back of the neck as he ducked to protect his head. The stick splintered on impact, imbedding a piece of bamboo in Jesse's skin. The stick split in two as they wrestled with it. Jesse wielded one piece of the broken stick in a defensive manner, and threw it at defendant who was coming at him. He may have struck defendant.

3

A motorist (who was an off-duty reserve police officer) called 911 and reported "a man with a large stick … fighting with three other males. [¶]…[¶] Across from the Jack in the Box." In real time he saw "the man swinging the stick and the guys yelling at him." Then he observed the man with the stick "walking across the street now" and arriving "at the Jack in the Box," and the three males at the Wienerschnitzel. Then he saw the three males "going across the street [¶]…[¶] running toward[]" the man with the stick, and an officer (Officer Lau) arriving at the Jack in the Box. He testified at the preliminary hearing "that the person with the stick was moving forward and the other two guys were moving backward."

A Wienerschnitzel employee testified that he spoke with defendant, whom he recognized as a local homeless man, after seeing him in the Jack in the Box parking lot confronted by several young men shouting obscenities. Laughing and appearing high, defendant approached the Wienerschnitzel window and told the employee that the males wanted to start a fight but " 'they don't know who they are messing with.' "

The employee testified that a short while later defendant returned to Wienerschnitzel with blood on his eye and asked to use the bathroom. He was followed by three males who asked the employee to call 911. One had a stick and said he had been hit. The employee called 911, reporting "a problem with … some drunk guy" and "gangster guys" fighting with that person. The employee was shown a still image of Ben, Sean, Jesse, Nick, and Juan captured from Officer Lau's car-mounted video camera. He recognized only Ben from that image as one of the three who came to the window, and he specifically recalled Ben saying " 'we're going to jump him.' " He recognized Juan from a different photograph as also being at the window that night. According to the employee, defendant crossed the street and entered Jack in the Box, the males followed

4

defendant, and because of the way they were acting, the employee believed they were "look[ing] for further trouble."

Officers located defendant and a piece of a bamboo stick behind a retaining wall next to Jack in the Box. Defendant, Sean, Ben, Jesse, and Nick were interviewed at the scene. Defendant told Officer Lau repeatedly that he had been "rat-packed" by about "six of them" as he was returning to Jack in the Box for his metal cane. He pointed out Ben as the "main one" who told the others to "get him," and Nick (who had already identified himself to Officer Lau as a Marine) as the male who struck him in the eye with a stick while the others said "[b]ang him, bang him." He said he defended himself, although he denied striking anyone. Officer Lau determined defendant to be the aggressor and arrested him.

A forensic pathologist testified that the bamboo stick was capable of inflicting great bodily injury or death. The injuries depicted in the photos of Sean and Jesse were consistent with being struck by a bamboo stick, but the amount of force used could not be determined from the photos. The pathologist explained that although uncommon, a blow to the ear or neck area could lacerate or dissect the vertebral artery, causing death. She considered Jesse lucky given his neck injury because it "only take[s] one blow at the wrong angle" or with the "head being turned that can cause a devastating injury, which can ultimately lead to death."

Defendant was charged with two counts of assault with a deadly weapon on Sean and Jesse. (Pen. Code, § 245, subd. (a)(1).) The information alleged he committed the offenses using a dangerous and deadly weapon (a bamboo stick) within the meaning of Penal Code sections 667 and 1192.7. The information alleged three prior felony convictions under the Three Strikes law (Pen. Code, §§ 667, subd. (b)–(i); 1170.12); three prior serious felony convictions within the meaning of Penal Code section 667,

5

subdivision (a); and two prior prison terms within the meaning of Penal Code section 667.5, subdivision (b).

A jury convicted defendant of the assaults including the special allegation, and the trial court found true the prior convictions. The trial court denied defendant's motion to reduce the counts to misdemeanors under Penal Code section 17, subdivision (b) and to strike the prior convictions in the interest of justice under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. Defendant was sentenced to concurrent terms of 25 years to life consecutive to 15 years. The prior prison term enhancements were stayed.

## II. DISCUSSION

### A. UNCHARGED ACT EVIDENCE

#### 1. Evidence Code Section 1101(b)

Evidence that a person committed a crime or other act is admissible to prove a fact other than propensity, such as motive, intent, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).) The Supreme Court has identified three factors essential to the admissibility of such other-act evidence (sometimes referred to as evidence of an uncharged act or an uncharged crime): "(1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence." (*People v. Thompson* (1980) 27 Cal.3d 303, 315 (*Thompson*), superseded on other grounds as stated in *Clark v. Brown* (9th Cir. 2006) 442 F.3d 708, 714, fn. 2.)

The first factor—materiality—is not at issue in this case, as the fact sought to be disproved by the prosecution relates to defendant's mental state: whether defendant had an objectively reasonable belief in the need for self-defense. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Wells* (1949) 33 Cal.2d 330, 345 [self-defense is

6

"limited to such acts as are either *actually* reasonably necessary or which would appear to a *reasonable* person, under the same circumstances, to be reasonably necessary"].)  The parties dispute the second and third factors under *Thompson*—relevance and exclusion.

Under the second factor, an uncharged act may be relevant circumstantial evidence of motive or specific intent, undermining a self-defense claim.  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 14 (*Demetrulias*) [uncharged act was circumstantial evidence of motive and specific intent to rob, negating self-defense claim]; *People v. Simon* (1986) 184 Cal.App.3d 125, 130–131 (*Simon*) [jealousy motive, if shown by uncharged act, may be admissible to establish same motive and undermine self-defense claim].)  Under what is referred to as the doctrine of chances, an uncharged act may be relevant "to prove intent 'as a generic notion of criminal volition or willfulness, including the various non-innocent mental states accompanying different criminal acts.' "  (Leonard, The New Wigmore:  Evidence of Other Misconduct and Similar Events (2d ed. 2019) § 7.3.2, p. 486.)

Reciting from an earlier Wigmore treatise, our Supreme Court described the doctrine of chances as capturing " 'the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all.' "  (*People v. Robbins* (1988) 45 Cal.3d 867, 879 (*Robbins*), quoting from 2 Wigmore, Evidence (Chadbourn rev. 1979) § 302, at p. 241.)  The doctrine embraces an improbability theory:  " '[A]n unusual and abnormal element might perhaps be present in one instance, but [] the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.' "  (*Robbins*, at p. 879.)  In other words, the doctrine of chances applies where the coincidence between two (or more) events

7

"becomes too abnormal, bizarre, implausible, unusual or objectively improbable to be believed." (The New Wigmore, *supra*, § 7.3.2, p. 487.)[1]

A trial court must "examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong." (*People v. Schader* (1969) 71 Cal.2d 761, 775.) "If the connection between the uncharged offense and the ultimate fact in the dispute is not clear, the evidence should be excluded." (*Thompson*, *supra*, 27 Cal.3d at p. 316.)

The third *Thompson* factor recognizes extrinsic policies limiting admissibility of uncharged acts. Because " 'substantial prejudicial effect [is] inherent in [such] evidence,' " uncharged acts are admissible under Evidence Code section 352 only if they have substantial probative value. (*Thompson*, *supra*, 27 Cal.3d at p. 318; *People v.*

---

[1] By way of illustration, the Supreme Court recognized the doctrine of chances as a basis for inferring criminal intent in *Demetrulias.* The uncharged conduct in *Demetrulias*—a robbery accomplished by assault occurring almost immediately after the charged murder—showed the defendant acted with a motive to take the assault victim's money; a rational inference therefore could be drawn that the defendant acted with the same motive for money rather than in self-defense when he stabbed the murder victim hours earlier. (*Demetrulias*, *supra*, 39 Cal.4th at pp. 7, 14.) The uncharged assault was also substantially similar to the murder to bear on the defendant's specific intent to rob in committing the murder: "Twice in one evening, the defendant entered an older man's home, confronted the man alone, and stabbed the man several times hard enough to inflict serious wounds, including in both cases stab wounds to the chest." (*Id.* at p. 16.) The defendant acknowledged having pleaded guilty to the robbery and assault against the second victim, yet he testified that he had acted in *both* instances in self-defense. (*Id.* at pp. 8, 9, 19.) Invoking the doctrine of chances, the Supreme Court observed that a "jury could rationally find it unlikely that defendant had the extremely bad luck to be attacked within a short period of time by two older solitary men in ways that required him to use potentially deadly force against the older men to repel the attacks." (*Id.* at p. 16.) Instead, the jury could rationally infer "that defendant probably attacked both men with the same criminal intent—robbery." (*Ibid.*)

*Ewoldt* (1994) 7 Cal.4th 380, 404 ["Evidence of uncharged offenses " 'is so prejudicial that its admission requires extremely careful analysis' "]; *People v. Lewis* (2001) 25 Cal.4th 610, 637 [" '[T]he probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury' "].)  The probative value of evidence depends on the degree of relevancy (the extent to which the evidence tends to prove an issue by logic and reasonable inference), materiality (the importance of the issue to the case), and necessity (the need to prove the issue by means of the uncharged act).  (*Thompson*, at p. 318, fn. 20.)

A trial court's rulings under Evidence Code sections 1101 and 352 are reviewed for abuse of discretion (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 239 (*Hendrix*)), with attention paid to " 'the legal principles and policies that should have guided the court's actions.' "  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

### 2.  Evidence Presented of 2007 and 2012 Conduct

Defendant presented a defense through his recorded statement to Officer Lau that he acted in self-defense against a group of young men who "rat-packed" him.  To rebut that defense, the prosecution sought to present evidence of several past altercations in which defendant had also claimed self-defense.  The trial court reasoned that prior claims of self-defense would be admissible rebuttal evidence under Evidence Code section 1101, subdivision (b) and *Demetrulias* to prove absence of a good-faith reasonable belief in the need for self-defense, if the acts were "similar enough" to the instant case.

The prosecution offered that in 2007 defendant injured an elderly person by strangulation, claimed self-defense to the responding officer, and later admitted there was

9

no threat requiring self-defense.  The victim in that incident was defendant's father who had reported being choked when defendant tried to break into his home.  Defendant had reported that his father was mentally ill and started a fight, and defendant punched him to get away.  Regarding a 2012 assault, the prosecution offered that defendant was in an altercation with a homeless person at a bus stop.  Defendant was intoxicated, used his cane to strike the victim in the head, and claimed self-defense both at the scene and at a trial which resulted in an acquittal.

Ruling from the bench, the trial court noted five facts regarding the instant case: defendant inflicted wounds; to the head; with an object; while intoxicated; and claimed self-defense.  The court observed in both the 2012 incident and the instant case that defendant struck the victim in the head with a cane while intoxicated and claimed self-defense, and defendant also claimed self-defense in the 2007 case.  The court did not address defendant's argument that the uncharged acts evidence would be more prejudicial than probative.  Based on the prosecution's case-in-chief and offers of proof regarding assaults in 2007 and 2012, the trial court ultimately ruled that the two past assaults were admissible.  A 2005 assault was not admitted as other-act evidence because there defendant did not claim self-defense.  But that conviction was admitted as impeachment evidence, along with five other felony convictions—burglary in 1989, assaults in 1999 and 2001, and the 2007 assault and associated burglary.)

At trial, a Los Angeles police officer testified regarding the 2007 incident that he responded to a battery in progress at the home of defendant's 66-year-old father where he observed signs of forced entry into the home (a screen removed from an open window).  Defendant did not appear intoxicated, he had a small mark on his arm, and he told the officer he had punched his mentally disturbed father who had bitten his arm.  Defendant's

10

father had a scraped arm, and lacerations on his chin and leg. He was upset and excited, but he did not appear mentally ill. Defendant pleaded guilty to assault and burglary.

Regarding the 2012 incident, a Santa Clara County sheriff's deputy testified that he saw defendant at a bus stop strike a 41-year-old man with a metal cane several times, and then grab a set of headphones from the man's hands. Both men appeared homeless and intoxicated, and defendant was enraged. The officer did not see the altercation start. Defendant, who appeared uninjured, told the officer he and the other man knew each other, the other man had hit him in the face twice with a closed fist, grabbed him, and would not let him go. The other man was covered in blood, with injuries to his head and face. Ten color photographs were admitted in evidence over defendant's objection, including photographs of the man holding a gauze pad to his face with a bloody hand; the man, with a bloody face and bandaged head, being assisted by paramedics on a backboard; blood pooled on the ground by the bus stop bench; a metal cane with blood on the handle; and close ups of the man's head injuries. Defendant was charged with assault with a deadly weapon. The man died (for reasons unrelated to the charged incident) before that case was tried to a jury in September 2013. The deputy testified at that trial, and defendant was found not guilty.

### 3. Analysis

Defendant argues that the past acts lack substantial similarity from which to infer non-innocent intent under the doctrine of chances. In determining relevancy under the doctrine of chances, the question is whether, without relying on character inferences, the occurrence of both acts may lead to a conclusion that the defendant did not act with an innocent mental state in the charged act. The circumstances of both the charged and uncharged acts determine the relevance and probative value of the evidence. (The New Wigmore, *supra*, § 7.5.2., at p. 507; *Robbins*, *supra*, 45 Cal.3d at p. 880 [circumstances

11

of the uncharged act must be "sufficient to raise an inference that the [current] offense was committed with the charged intent(s)"].)

### a. The 2007 Evidence

The 2007 assault involved an altercation between defendant and his father. Defendant sought entry into his father's home by force. He physically fought his father without using a weapon, and he pleaded guilty to assault and residential burglary. The circumstances of the 2007 assault are similar to the instant case only in that defendant committed an assault and initially claimed self-defense. But the conduct itself does not increase the probability that defendant fabricated a self-defense claim several years later under entirely different circumstances—against a group of strangers in a public place. Unlike the facts in *Demetrulias*, where the uncharged assault occurred within hours of the charged murder and the evidence showed a common motive (*Demetrulias*, *supra*, 39 Cal.4th at p. 14), here we have unrelated assaults occurring six years apart with no similarities in circumstance or shared logical nexus. Nor does the decision to plead guilty to the 2007 charges allow a reasonable inference as to defendant's mental state in the instant case, where he maintained his self-defense claim at trial. Given the absence of a logical nexus between the prior offense and defendant's disputed mental state, the trial court's ruling was an abuse of discretion. (See *People v. Durham* (1969) 70 Cal.2d 171, 186–187 [the evidence should be excluded if a connection between the uncharged offense and the ultimate fact in dispute is not clear]; *People v. Sam* (1969) 71 Cal.2d 194, 203.)

### b. The 2012 Evidence

Defendant argues the similarities in the 2012 acts and the instant case (defendant was intoxicated, struck victims using a cane or walking stick, and told officers he had acted in self-defense) are not probative of his mental state in the current case because the proffered facts demonstrated that the 2012 self-defense claim was genuine. In a related

12

argument, he urges that the trial court erred under *Simon* by failing to make a finding under Evidence Code section 403, subdivision (a), that sufficient evidence existed for the jury to determine the existence of that preliminary fact. Respondent counters that the 2012 evidence showed defendant inflict force in excess of what was reasonable under the circumstances, demonstrating that he acted with a non-innocent intent to escape criminal liability.

### i. Evidence Code section 403

The prior act evidence in *Simon* showed two motives, one of which (jealousy) was relevant to the defendant's motive in the charged case. (*Simon*, *supra*, 184 Cal.App.3d. at pp. 128–129.) Because the prior act was admissible only if it was motivated by jealousy, the *Simon* court directed the trial court on remand to make a preliminary determination under Evidence Code section 403 whether the prior act evidence could support a jury finding under a preponderance standard that the prior act was motivated by jealousy. (*Id*. at p. 134.) Though the trial court here rejected defendant's request to conduct a hearing under Evidence Code section 403, finding the *Simon* case to be "in disagreement somewhat" with the more recent Supreme Court opinion in *Demetrulias*,[2] we infer from the trial court's acceptance of the prosecution's offer of proof that the evidence would be sufficient for the jury to find that defendant acted in 2012 with a non-innocent intent. Indeed, the purpose of the proffer was to identify the similarities to the charged assaults

---

[2] The trial court ruled the evidence admissible with a limiting instruction as in *Demetrulias*, that "the evidence, 'if believed' was not to be considered as showing defendant's bad character or 'disposition to commit crimes,' but only for the limited purpose of 'determining if it tends to show' a characteristic 'method, plan or scheme' similar to that used in the charged crime, the 'intent which is a necessary element of the crime charged,' or 'a motive for the commission of the crime charged.' " (*Demetrulias*, *supra*, 39 Cal.4th at p. 14.)

13

(including whether defendant's claim of self-defense was genuine), and the trial court was aware that the standard of proof on that issue is a preponderance of evidence.

Defendant argues that non-innocent intent cannot be inferred from the 2012 incident because it is not objectively improbable that a person in his circumstances could repeatedly face situations requiring self-defense. Under the doctrine of chances, the degree of relevance of an uncharged act will vary " 'according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent.' " (*Robbins*, *supra*, 45 Cal.3d at p. 880.) Drawing from the same authority as did the Supreme Court in *Robbins*, this court has explained that objective improbability (supporting an inference of wrongdoing) is based on three threshold criteria: "(1) each uncharged incident must be 'roughly similar to the charged crime' [citation]; (2) counting both charged and uncharged incidents, the accused must have been 'involved in such events more frequently than the typical person' [citation]; and (3) the existence of mens rea 'must be in bona fide dispute,' such that the prosecution has 'a legitimate need to resort to the uncharged misconduct evidence to prove intent' [citation]." (*People v. Rocha* (2013) 221 Cal.App.4th 1385, 1395, citing Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition* (1990) 51 Ohio St. L.J. 575, 593.)

Defendant urges that the second of Imwinkelried's criteria is not met here because acting in self-defense is not an infrequent occurrence for a person living on the streets. We agree that homeless persons are more vulnerable to violence than the housed population. (See *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 747 [recognizing that "homeless individuals are victims of violent crime at a much higher rate than the general population"].) But we are not persuaded that the two violent encounters

14

involving defendant represent such commonplace occurrences among the homeless population that they cannot support an inference of wrongdoing. Having remained in custody from arrest to acquittal on the 2012 case, defendant had been living on the streets for only 19 days between the assaults. Based on that temporal proximity and the similarities between the events, a reasonable jury could infer that on both occasions defendant acted with a non-innocent mental state. (See *Demetrulias*, *supra*, 39 Cal.4th at p. 16 [jury could infer from the totality of evidence that the defendant acted with the same criminal intent in two instances].)

### ii. Evidence Code section 352

We reach a different conclusion when we consider the effect of the evidence admitted about the 2012 event. " '[T]he probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury' " under Evidence Code section 352. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

The parties disputed whether defendant acted in self-defense in the 2012 incident. A police officer in his patrol car saw defendant striking the victim. Because the officer did not see how the altercation began, the prosecution discredited defendant's self-defense claim by establishing through testimony and photographs that defendant used more force than was reasonably necessary to defend against any claimed aggression. But the amount of force necessary and used in 2012 was not probative of whether defendant had a legitimate need to use self-defense in 2013. The issue here is not whether defendant used excessive force but whether a reasonable belief in perceived danger justified his use of force against Sean and Jesse. By focusing on the quantum of force used, the 2012 evidence would cause the jury to prejudge defendant on the basis of

15

extraneous character-based factors.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1331 [" ' "the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor" ' "].)  The graphic photographs depicting defendant as callous and violent were inflammatory and created a substantial danger of evoking an emotional bias against him.  (*Ibid*.)

We reject respondent's argument that the probative value of the 2012 incident was substantial given the similarities to the instant case, and thus outweighed any tendency to evoke emotional bias.  By itself, the force used in 2012 is not probative of defendant's mental state in 2013.  Although the events were similar (defendant assaulted someone using a cane or stick while intoxicated), that does not mitigate the inflammatory nature of the 2012 photographs, particularly when the injuries to the homeless man appeared serious, while the injuries to Sean and Jesse were relatively minor and did not require medical attention.

Evidence of the 2012 incident was further prejudicial because in this case the jury was aware that defendant had been acquitted of the 2012 charge.  That circumstance can produce " 'a "tendency to condemn, not because [defendant] is believed guilty of the present charge, but because he has escaped unpunished from [an] other offense[]." ' " (*People v. Foster*, *supra*, 50 Cal.4th at p. 1331.)

Although a limiting instruction can minimize the danger that a jury will consider evidence for an improper purpose (*Hendrix*, *supra*, 214 Cal.App.4th 216, 247), the court's instruction here did not serve that end given the issues in this case.  Using CALCRIM No. 375, the jury was cautioned appropriately that it must not conclude from the 2012 evidence "defendant has a bad character or is disposed to commit a crime"; the evidence "is not sufficient by itself to prove that the defendant is guilty"; and the prosecution "must still prove each charge and allegation beyond a reasonable doubt."

16

The same instruction, however, permitted the jury to consider the "evidence of other behavior by the defendant" if it decided he had committed "the uncharged acts." But it was not disputed that defendant committed the assaults on his father in 2007 and the homeless man in 2012; the issue was whether he had genuine self-defense claims in those instances. The instruction therefore did not squarely address the danger created by the uncharged act evidence, allowing the jury to determine defendant's mental state based on propensity. (*Hendrix*, at pp. 249–250.)

Respondent argues the instruction appropriately limited the jury's consideration to whether the uncharged acts " 'tend[] to show a motive, self-defense or some other innocent mental state,' or other relevant mental states." The trial court adopted CALCRIM No. 375 to include: "If you decide that the defendant committed the uncharged acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not this evidence tends to show a motive, self-defense or some other innocent mental state, or a characteristic method, plan or scheme." The instruction does not make clear that the uncharged act evidence may be considered specifically for establishing "motive, self-defense[,] some other innocent mental state, or a characteristic method, plan or scheme" in *this* case. Instead, it allowed the jury to consider motive and characteristics of the uncharged acts themselves, neither of which was relevant to the self-defense inquiry in the instant case.

### iii. The errors do not require reversal

Error in a criminal case is considered harmless unless it resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) The defendant must demonstrate that but for the error "it is reasonably probable that a result more favorable to the [defendant] would have been reached." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant contends that standard is met because the prosecution's case was not compelling and the prosecutor

17

used the prior act evidence to argue defendant has a propensity for violence. Respondent counters that defendant's role as initiator and aggressor was supported by the totality of the record because "not a single witness testified that [Ben] or any one of his friends did anything to place [defendant] in reasonable fear for his safety before [defendant] physically assaulted one or more of them." But the question is not whether evidence in the record is sufficient to support the jury's verdict. In examining an error for prejudicial effect, we do not view the evidence or presume facts in favor of the verdict. (*People v. Mil* (2012) 53 Cal.4th 400, 418.) Rather, we review the entire record to determine whether "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*Watson*, at p. 836.)

We give full consideration to the showing that defendant was outnumbered by several young men in the Jack in the Box parking lot, and to Ben's statement at the scene that he kicked defendant at that time. But we see no evidence suggesting that Sean was aggressive toward defendant which would justify defendant's use of force against Sean or against Jesse, who came to Sean's aid.

In the context of the altercation in the parking lot, we consider whether it is reasonably probable that one or more jurors would conclude that the prosecution failed meet its burden of proving beyond a reasonable doubt that defendant did not act in lawful self-defense if this case were tried without the erroneous admission of the prior acts evidence. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 523.) Lawful self-defense requires (1) that defendant reasonably believed he was in imminent danger; (2) that the immediate use of defensive force was necessary to defend against that danger; *and* (3) that defendant used no more force than necessary to defend against the danger. (CALCRIM No. 3470; *People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [what is

18

reasonable under the circumstances is determined from the point of view of a reasonable person in the defendant's position].)

We reject defendant's argument that individually or cumulatively the evidentiary errors rise to the level of a due process violation, which would place the burden on the prosecution to show harmlessness beyond a reasonable doubt. The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.' " (*Dowling v. United States* (1990) 493 U.S. 342, 352.) For the erroneous admission of evidence to amount to a denial of due process, the evidence must have been " 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.' " (*Johnson v. Ross* (2nd Cir. 1992) 955 F.2d 178, 181.) That standard has not been met here.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that trial counsel rendered ineffective assistance by not objecting to Officer Lau's testimony regarding his reasons for arresting defendant. Officer Lau testified that he considered defendant to be a suspect based on the evidence, statements provided by the victims and witnesses, and the demeanor of the victims and defendant. He testified that defendant was arrested even though he claimed to be the victim, "[b]ased on the statements from all the witnesses" and Jesse's injuries and complaint of pain. According to defendant, Officer Lau implicitly opined that the young men and the reserve officer who called 911 were being truthful, and defendant was not, which constituted inadmissible lay opinion and counsel should have objected.

An ineffective assistance claim requires a showing both that counsel's performance fell below an objective standard of reasonableness and that defendant was prejudiced by the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668,

19

687.)  The record on appeal must "affirmatively disclose[] that counsel had no rational tactical purpose for his act or omission."  (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.)  And defendant must show a reasonable probability of a more favorable result but for trial counsel's errors.  (*Strickland*, at p. 694.)  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  (*People v. Williams* (1997) 16 Cal.4th 153, 215.)  Defendant has not met that burden here.

Lay opinion testimony is admissible if it is "[r]ationally based on the perception of the witness," and "[h]elpful to a clear understanding of his testimony."  (Evid. Code, § 800, subds. (a)–(b).)  But lay opinion "about the veracity of particular statements by another is inadmissible on that issue."  (*People v. Melton* (1988) 44 Cal.3d 713, 744.)  A law enforcement officer's testimony regarding the focus of a criminal investigation is not considered inadmissible lay opinion.  (*People v. Virgil* (2011) 51 Cal.4th 1210, 1254.)  In *Virgil*, a detective testified that he began to consider the defendant a suspect in a murder investigation because the composite of the suspect resembled the defendant, whom he had recently interviewed about an unrelated burglary.  (*Id*. at p. 1230.)  The *Virgil* court held that the challenged testimony "was based on the detective's perceptions and was helpful for the jury to understand how [the detective] came to suspect defendant was connected to the [charged] homicide."  (*Id*. at p. 1254.)  The same cannot be said here.  Defendant was arrested at the scene.  Officer Lau's testimony regarding his perceptions of the scene and the individuals involved in the altercation was unnecessary to explain how the investigation unfolded and resulted in defendant's arrest.  His observations about the demeanor of the victims, witnesses, and defendant and his consultation with the officers who interviewed the victims and witnesses went beyond explaining his investigative steps.  Although an officer's testimony with respect to whether he believed a witness may be admitted to " 'assist[] the jury in understanding the actions of the

20

police' " (*People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 33), because there was no need for such assistance here the testimony at issue served only as implicit vouching for the credibility of certain participants over that of defendant.

Even though an objection to some of Officer Lau's testimony should have been made and sustained, defendant has not shown prejudice. It is axiomatic that Officer Lau believed he had grounds to arrest defendant. But that decision was not central to the trial, which focused on the recollections of defendant, the victims, and the witnesses. The video-recorded interviews of Sean and defendant were played for the jury, along with the recorded portion of Ben's interview. The jury also saw the footage from Officer Lau's car-mounted video camera as he arrived on scene and conducted his investigation. The jury was instructed, "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial," and "[y]ou alone must judge the credibility or believability of the witnesses." Nothing in the record undermines our confidence that the jury followed those instructions and decided the issues based on its own assessment of the evidence. (See *People v. Riggs* (2008) 44 Cal.4th 248, 300.)

## C. SENTENCING ISSUES

### 1. Discretion Under Penal Code Section 17(b)

A trial court has discretion to reduce an assault to a misdemeanor at the time of sentencing. (Pen. Code, § 17, subd. (b)(1), (3).) Factors relevant to the trial court's decision include " 'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, [and] his traits of character as evidenced by his behavior and demeanor at the trial.' " (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 978 (*Alverez*).) Courts may also consider the sentencing objectives set forth in California Rules of Court, rule 4.410. (*Ibid*.) Those include protecting society,

punishing the defendant, deterring crime, encouraging the defendant to lead a law-abiding life, and preventing the defendant from committing new crimes. (Cal. Rules of Court, rule 4.410(a).) The trial court's discretion under Penal Code section 17(b) is broad, and it will not be disturbed on appeal unless it is clearly shown the decision was irrational or arbitrary. (*Alvarez*, at p. 977.) Absent such a showing, we presume the trial court acted to achieve legitimate sentencing objectives. (*Ibid*.)

In declining to reduce the offenses here to misdemeanors, the trial court commented: "It's not a good idea for any judge in any circumstance to substitute his or her personal opinion for the verdict of the jury. [¶] If they're going to ignore the jury, why bother to have juries." Defendant argues the trial court misunderstood (and thus abused) its discretion by acceding to the jury's guilty verdict. Defendant is correct that a jury's verdict does not inform the sentencing court's discretion under Penal Code section 17; otherwise, a conviction by jury would preclude reduction under subdivision (b) of that section. But the trial court further explained its ruling: "And also I think it would be inappropriate in this case, in view of the seriousness of the offenses and the defendant's extreme – extensive criminal history and the defendant's version of the offense, which I am sure is heartfelt but at odds with the testimony of everybody else who was present at the time. It could have been very serious if the stick, bamboo stick or cane, as it was being used, had hit in a slightly different area. For that reason, I think that the reduction for misdemeanor is inappropriate." he trial court's reasoning focused on the facts of the case, defendant's criminal history, and public safety, all appropriate considerations upon which to deny the requested relief. (*Alvarez*, *supra*, 14 Cal.4th at p. 978 ["[A] determination made outside the perimeters drawn by individualized consideration of the offense, the offender, and the public interest" constitutes an abuse of discretion].)

22

Defendant argues that the trial court abused its discretion by failing to give "reasoned consideration" to his background, mental condition, age, and the circumstances of the offenses. The Supreme Court in *Alvarez* explained that the trial court, in exercising its authority to reduce a wobbler in a case involving three prior strikes, must undertake "an intensely fact-bound inquiry taking all relevant factors, including the defendant's criminal past and public safety, into due consideration; and the record must so reflect." (*Alvarez*, *supra*, 14 Cal.4th at pp. 981–982.) In declining to reduce the offenses here, the trial court stated that it had read and considered defendant's moving papers. The motion urged a misdemeanor sentence because the injuries were minor, the victims were neither vulnerable nor faultless, the weapon was a hollow bamboo stick, and but for his prior convictions which were closely connected to his chronic homelessness and mental health issues, the offenses likely would have been charged as misdemeanors. Defendant argued the assaults occurred after he was kicked in the chest, and his conduct was mitigated by his history of sexual and physical abuse, substance abuse, mental illness, and traumatic brain injury. Defendant supported his motion with a 2011 psychological assessment attributing anger control issues and debilitated daily functioning to post-traumatic stress disorder and traumatic brain injury; a 2012 medical evaluation (after being hit by a car as a pedestrian) noting bipolar disorder, alcoholism, post-traumatic brain injury, post-traumatic stress disorder, and facial bone fractures; and county jail mental health records from 2014 noting bipolar disorder, post-traumatic stress disorder, alcohol dependence, and positive results from medication (Effexor, Remeron, and lithium).

We do not read *Alvarez* as requiring the trial court to reiterate defendant's argument on the record when declining to reduce the offenses to misdemeanors. The trial court stated that it had read defendant's moving papers, and the record reflects a decision

23

based on "individualized consideration of the offense, the offender, and the public interest." (*Alvarez*, *supra*, 14 Cal.4th at p. 978.) While the record here may also have supported a different conclusion, we find no error in light of the deferential standard of review.

### 2. Discretion Under Penal Code Section 1385

A trial court has discretion to dismiss a prior conviction alleged under the Three Strikes law. (Pen. Code, § 1385, subd. (a); *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.) In exercising its discretion, the court must consider whether "in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) Factors in aggravation and mitigation listed in the California Rules of Court may be relevant to the court's inquiry. (*People v. Cuff* (2001) 87 Cal.App.4th 991, 1004.)

We review the denial of a motion to dismiss a strike allegation for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) Abuse of discretion in failing to strike a prior conviction occurs in limited circumstances: where the trial court is not aware of its discretion; where the trial court considers impermissible factors; or where applying the Three Strikes law would produce an arbitrary, capricious, or patently absurd result under the specific facts of a particular case. (*Id.* at p. 378.) A reviewing court's disagreement with the trial court's weighing of proper factors (as distinct from the trial court's reliance on improper factors in the weighing process) does not constitute an abuse of discretion. (*Id*. at p. 379.)

24

Defendant has suffered three prior strike convictions: a 1989 conviction for residential burglary (Pen. Code, § 459); a 2005 conviction for assault with a deadly weapon (Pen. Code, § 245(a)(1)); and a 2007 conviction for residential burglary (Pen. Code, § 459). The trial court denied defendant's motion to strike the prior strikes, after considering relevant factors and concluding that defendant did not fall outside the scope of the Three Strikes law. The trial court considered the age of the prior convictions, noting that "some" are remote in time, but also finding "it's part of [defendant's] continuous history of criminal conduct" and violence. The court noted that the current offenses are wobblers, and that defendant expressed remorse for his conduct. It acknowledged as "possible" that defendant's criminal history resulted from addiction, but also observed that "it's not true that every alcoholic becomes violent." It found defendant to be a dangerous person who has been unable to conduct himself as a law-abiding citizen for long periods of time. It described defendant's professed willingness and ability to rebuild himself as "sort of true, except that… [m]ental health services have been available for decades now, but no one can make anyone go and take advantage of them." In considering whether the present offenses were committed because of unusual circumstances unlikely to reoccur, the trial court referred without elaboration to "the similarity of these events to past offenses." It acknowledged that "defendant has a life long history of mental health issues," but that "he also has a life long history of assaultive behavior." Perhaps most notably, the trial court considered whether punishment under the Three Strikes law would be disproportionate to the severity of the current offenses, stating "[t]hat might apply marginally," but it concluded in denying the motion that a Three Strikes sentence would not be disproportionate to defendant's criminal history.

Although sentencing did not take place until two months after the hearing on the motion, given defendant's three prior strikes and the then-mandatory five-year

25

enhancements for three prior serious felonies (Pen. Code, § 667), it would have been apparent when the trial court denied the motion that defendant would be sentenced to at least 25 years to life consecutive to 15 years.

Repeating the points he raised at sentencing, defendant argues that the trial court abused its discretion because (1) the 1989 conviction for residential burglary was old and did not involve violence; (2) in the current case defendant was provoked and suffered injury, while the victims suffered only slight injury; (3) had the court struck two or all three of the prior strikes, defendant still would have been exposed to a significant sentence; and (4) most significantly, the sentence fell outside the spirit of the Three Strikes law because defendant had endured a violent and abusive upbringing, had been homeless since his mid-teens, and had a long history of alcoholism and mental illness, all of which contributed to his criminal conduct. The 2011 psychological assessment, 2012 medical evaluation, and 2014 jail treatment records appended to defendant's motion amply support the stated history and diagnoses, as we have previously summarized.

A trial court's sentencing discretion is very broad, and rightly so. Among other considerations, as a reviewing court we are not able to observe the demeanor of defendants or witnesses, and we therefore do not substitute our discretion for that of the trial court. Notwithstanding its broad discretion and our deferential standard of review, a trial court's ruling on a *Romero* motion remains reviewable. The sentence of 25 years to life consecutive to 15 years imposed here presents that rare instance of an absurd result under the Three Strikes law that goes beyond mere disagreement with the trial court's decision. We will therefore reverse and remand for reconsideration.

The trial evidence shows that defendant's criminal behavior here resulted from a late-night, spontaneous altercation between an intoxicated and mentally ill homeless person and a group of youths. Defendant struck two members of a group of five young

26

men with a bamboo stick, scratching one and raising a welt on the neck of the other. Witnesses did not provide a clear picture of the genesis of the encounter between defendant and the young men.  Defendant also was injured.  Following the jury's verdict in a trial in which we have concluded the trial court committed a number of evidentiary errors, the trial court elected to impose a sentence of 25 years to life consecutive to 15 years, de facto life imprisonment for defendant who was 53 years old when sentenced.

The record does not support the trial court's conclusion that this nighttime encounter between defendant and the young men outside two fast food restaurants was similar to defendant's prior strikes which, as described in the sentencing report prepared by the Probation Department, were characterized by either substantial violence or the deliberate entry into homes to steal.  We recognize, as did the trial court, that defendant has a number of significant prior convictions, but they are not similar to the events underlying this case.

As the sentencing report recognized, defendant's circumstances were critical here. Citing defendant's "history of homelessness, mental health issues, and alcoholism [which] most likely contributed to his actions," the Probation Department stated that the trial court could exercise its discretion under *Romero*, "given the punishment under the present Strike Law is disproportionate to the severity of the present offense."

On these facts, while the jury was entitled to return a guilty verdict on the charged offenses, we respectfully disagree with the trial court's determination that a sentence tantamount to life in prison was proportionate.  Considering all the evidence and circumstances in this particular record, we conclude that the trial court abused its discretion by denying defendant any meaningful relief from the Three Strikes law.  We express no opinion about how many strikes should be stricken on remand.  We conclude

only that—in declining to strike any—the trial court abused its discretion under the principles set out in *Romero*.

### 3. Statutory Changes to Sentencing Enhancements

The trial court imposed three 5-year prior serious felony enhancements under Penal Code section 667, subdivision (a) and two stayed 1-year prior prison term enhancements under Penal Code section 667.5, subdivision (b).  At the time of sentencing, section 1385 prohibited a judge from striking a prior serious felony enhancement (Pen. Code, § 1385, former subd. (b)), and prior prison term enhancements applied to terms served for all felony convictions (Pen. Code, § 667.5, former subd. (b)), although enhancements under Penal Code sections 667 and 667.5 could not be imposed for the same prior offense.  (*People v. Jones* (1993) 5 Cal.4th 1142, 1153.)  The trial court now has discretion to strike prior serious felony enhancements (Pen. Code, § 1385; Stats. 2018, ch. 1013, § 2 (S.B. 1393), effective Jan. 1, 2019), and prior prison term enhancements are now limited to prison terms served for sexually violent offenses (Pen. Code, § 667.5, subd. (b); Stats. 2019, ch. 590, § 1 (S.B. 136) eff. Jan 1. 2020).  The amendments apply retroactively because they are ameliorative and defendant's judgment was not final before their effective dates.  (*In re Estrada* (1965) 63 Cal.2d 740, 744–748 [new statute allowing lesser punishment applies retroactively to nonfinal judgments]; *People v. Francis* (1969) 71 Cal.2d 66, 75–78 [new statute authorizing sentencing discretion retroactively applies to nonfinal judgments]; *People v. Lopez* (2019) 42 Cal.App.5th 341–342 [S.B. 136 applies retroactively to nonfinal judgments]; *People v. Garcia* (2018) 28 Cal.App.5th 558, 971–972 [S.B. 1393 applies retroactively to non-final judgments].)

Defendant argues we should remand the matter for resentencing in light of S.B. 1393.  Citing *People v. McDaniels* (2018) 22 Cal.App.5th 420 and *People v. Gutierrez*

28

(1996) 48 Cal.App.4th 1894, respondent argues that the trial court's denial of defendant's motion under *Romero* and Penal Code section 17, subdivision (b) clearly shows it would not have dismissed the prior serious felony enhancements if given the opportunity to do so. The court in *Gutierrez* held that resentencing was required in Three Strikes cases pending appeal at the time the Supreme Court issued *Romero* (holding trial courts may strike prior strike convictions in furtherance of justice (13 Cal.4th at p. 497)), "unless the record shows that the sentencing court clearly indicated that it would not, in any event, have exercised its discretion to strike the allegations." (*Gutierrez*, at p. 1896.) The clear indication standard was extended in *People v. McDaniels* to resentencing under newly enacted Penal Code section 12022.53, subdivision (h), providing for the discretionary dismissal of a gun enhancement. (*McDaniels*, at p. 425.)

We are not persuaded that the denial of defendant's motion is a clear indicator of how the trial court would exercise its new discretion to strike prior serious felony enhancements. The trial court denied relief under Penal Code section 17, subdivision (b) because of the seriousness of the offenses and defendant's criminal history. The trial court denied relief under *Romero* because in the court's view defendant did not fall outside the spirit of the Three Strikes law. The new inquiry is different: whether, in the interest of justice, defendant's sentence should be reduced by 5, 10, or 15 years. We will instruct the trial court on remand to exercise its new discretion under sections 667, subdivision (a) and 1385.[3]

---

[3] We will further direct the trial court on remand to strike the prior prison term enhancements, which no longer apply to defendant's underlying convictions. The transcript of the sentencing hearing reveals the trial court's intent to strike (not stay) those enhancements under *People v. Jones*, *supra*, 5 Cal.4th at p. 1153. While we have authority to correct that clerical error on appeal (*People v. Haskin* (1992) 4 Cal.App.4th 1434, 1441), in light of our remand, the appropriate course is for the trial court to conform its sentence to S.B. 136.

### III. DISPOSITION

The judgment is reversed. The matter is remanded for the trial court to: (1) strike the prior prison term enhancements, which no longer apply to defendant under Penal Code section 667.5, subdivision (b) as amended; (2) exercise its discretion under Penal Code section 1385 as to the prior serious felony enhancements; and (3) enter a new order granting defendant's *Romero* motion, in whole or in part, to arrive at what the trial court determines is a just sentence that is proportionate to defendant's offenses and appropriate to defendant's history and circumstances. The trial court shall enter an amended judgment and transmit a new abstract of judgment to the Department of Corrections and Rehabilitation.

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Danner, J.

**H043029 -** *The People v. Dryden*

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Case No.: C1367902 |
| Trial Judge: | Hon. Michele McKay McCoy |
| Attorneys for Plaintiff/Respondent<br>The People: | Xavier Becerra<br>  Attorney General of California<br>Gerald A. Engler<br>  Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>  Senior Assistant Attorney General<br>Eric D. Share<br>  Supervising Deputy Attorney General<br>Ashley Harlan<br>  Deputy Attorney General |
| Attorneys for Defendant/Appellant<br>James Dryden: | Jim Hee Kim<br>Dwyer & Kim LLP |